FOURNET, Justice.
 

 Defendant, Mrs. Adele Spiro, divorced wife of Harry A. Mathe, has appealed from a judgment decreeing her to be disinherited under the terms of the testaments of her late mother and father.
 

 Mrs. Sarah Lissa Spiro, defendant’s mother, died testate on April 9, 1938, leaving surviving her, in addition to defendant, three children, Ruby Spiro, widow of Tobias Pick, Edward Spiro, and Joseph Spiro, issue of her marriage to Louis Spiro, who also survived her. Defendant opened her mother’s succession on June 8, 1938, praying that a search be made for her will. On June 14, by the petition of defendant’s father, Mrs. Spiro’s olographic will dated April 17, 1911, was probated, and by the provisions thereof defendant was disinherited for the reason that she married during her minority without the consent of her parents. On August 1, 1939, defendant’s father, two brothers, and sister were placed in possession of decedent’s property upon the ex parte judgment of the lower court. Defendant, not having been made a party to the proceedings, appealed from the judgment under the provisions of Article 571 of the Code of Practice, and we annulled the judgment for the reason that under the express provisions of the Revised Civil Code the depriving of a forced heir of his legitime by the effect of disinherison must .be by one of the forms prescribed for testaments and the testator must not only set forth in the will the cause for disinherison, but the other heirs of the testator must, contradictorily with the disinherited persons, prove the facts on which the disinherison is based. See Succession of Lissa, 195 La. 438, 196 So. 924. Defendant was likewise disinherited under the terms of the last will of her father who died on January 13, 1940. The will, nuncupative in form by public act dated May 30, 1939, was duly probated. The two successions were subsequently consolidated, and on March 26, 1940, this suit was filed by defendant’s sister and two brothers for the purpose of proving the facts on which her (defendant’s) disinherison was based.
 

 
 *134
 
 The defendant denied that she had married without the consent of her parents and, in the alternative, pleaded that she had been expressly forgiven by her parents, each of whom had become reconciled with her and had condoned the marriage.
 

 The case went to trial on these issues, and the trial judge concluded, as to defendant’s first contention, that she had married without the consent of her parents while still a minor. As to her alternative plea he concluded, as was contended by counsel for plaintiffs, that since it is the mandatory requirement of the Revised Civil Code that disinherison be by one of the forms prescribed for testaments and no specific provision is made for the revocation of a disinherison, the same can only be revoked in the manner in which it is established. Consequently he was of the opinion that no other proof that the deceased condoned or became reconciled to the injury done him could be introduced and considered, although, in order to complete the record, he did admit parole testimony and referred it to the merits.
 

 The trial judge’s conclusion that the defendant married without the consent of her parents while still a minor is amply supported by the record. This leaves for our consideration, therefore, whether or not the judge erred in his ruling on the issues raised by the defendant’s alternative plea and the weight and effect of such testimony in the event we conclude he did.
 

 Counsel for defendant contend that since this court has never passed on the issues squarely presented under the facts of this case, and there being no specific provision in the Revised Civil Code for the manner in which a disinherison may be revoked, a thorough understanding of the causes that gave rise to the law of disinherison is essential to our decision under Article 21 of the Revised Civil Code, which provides that: “In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent.” To this end they have submitted a brief which has been of great assistance to the court because of the collection and translation of the Roman, Spanish, and French authorities on this subject, and the exhaustive review of the historical development of the doctrine of disinherison, stated in the brief to be the work of Mr. Leandre Marechal, Lecturer on Civil Law Research in the Loyola University School of Law.
 

 In drafting from the customs of the people and antiquated legal precepts what is known today as the Twelve Tables of Roman Law, the foundation on which rests the vast and complex judicial system of the modern world, the ancient sages of Rome gave the father absolute and unquestioned power over the destiny and lives of his 'family. Under this law he could disinherit his children by making other disposition of his estate. Beginning with the Institutes of Gaius in 161 A.D., however, this Draconian right was gradually tempered as civilization progressed. The first important step in this evolution was the “querela inoflfiociosum testamentum.” By this innovation it was decreed that a man who had
 
 *136
 
 disinherited his children did not have the necessary mental capacity to make a will and, under this pretext or fiction, the testament was annulled. The theory behind this ruling was that such an action was not consistent with the moral duty of a parent toward his child and was contrary to natural paternal sentiment and affection, not that the testator was actually insane.
 

 Up to the time of Justinian the theories of the “querela” and of disinherison had a parallel development. He simplified and coordinated this complex system into a perfect whole in his Novels 18 and 115. Under the 18th Novel, ascendants were legally bound to leave to their descendants, by way of instituted heirship, a certain portion of their estate. This portion of which the “decujus” could not dispose was called the “legibus debita portion, legitima pars,” from which the Civil Law expression of "legitime” is derived. But Justinian also provided that the instituted heir could be disinherited for the causes, fourteen in number, enumerated in his 115th Novel. The child could be
 
 disinherited,
 
 by his father for all fourteen of these causes, or any one of them, but the commentators have invariably discussed them in two groups, the first, consisting of the first ten causes, being grouped together because they all referred to cases in which the child had done the father some wrong; the second, consisting of the last four causes, being considered from the standpoint that the testator had the right to disinherit the child because of the child’s personal unworthiness. Thus it may be seen that the law of forced heirship and the law of disinherison are both products of the Roman law, springing almost simultaneously from the same source.
 

 Under the Roman law, however, because of the precept that a testament could only be cancelled by another testament, a provision for disinherison could only be annulled by the making of another will in which the disinherison was revoked.
 

 The fundamental judicial conceptions and specific doctrines of the Roman or civil law have found their way into every legal system existing in the civilized world. The influence on the common law resulted in the English recognition of the unqualified power to disinherit enunciated in the Twelve Tables, although this has never been expressly admitted by the English commentators. In Spain and France the influence of the Roman law was more direct. These two countries, while not adopting the Roman conception of the method of revoking disinherison, did appropriate the provisions of the law of disinherison found in Justinian’s Novels in their entirety, with few changes.
 

 A majority and minority view of the method by which a disinherison might be revoked grew up in France, due to the fact that France was, in its early period, a land of written and unwritten (or customary) law. The southern portion of France, lying closest to Rome, and greatly influenced thereby, derived its law from the written law of the Romans. In the northern portion the law sprang from the customs of the people settling there from Germany and other countries. Consequently,, the doctrines of legitime and disinherison
 
 *138
 
 formed a part of the written law of southern France and were interpreted in the light of the Roman concept. These doctrines, on the other hand, being foreign to the customary law of northern France, formed no part thereof. We do find, however, a provision very similar to those which established the “legitime” in southern France, called in the customary law the “reserve.” We also find that heirs who were deprived of this “reserve” were able to bring an action called “ab irato” and prove this deprivation arose from motives of hatred.
 

 Because of the establishment of important centers of legal and general development in the north, the customary laws of France, now referred to as the Customs of Paris, became, in time, the predominant law of the land. The result was a majority view, following the customary law, based on the theory that since the right to disinherit was a penalty for the infliction of a personal injury, the offended party could forgive the offense and revoke the penalty, i. e., the disinherison. Under this view disinherison could be rendered inefféctive in three ways: (1) By an express revocation in a new will; (2) by a codicil to the old; or (3) by a reconciliation between the testator and the disinherited person. In reaching this conclusion the jurists reasoned that disinherison, being so contrary to all of the natural instincts of paternity, forgiveness was presumed to be a manifestation of the testator’s condonation of the injury done him and the cancellation of the disinherison.
 

 When the written and unwritten systems of law were unified in the Code Napoleon, the customary law and the jurisprudence thereunder exerted the major influence, although Justinian’s work was the structure on which the code was patterned. It may be that the desire to merge these two systems into a perfect whole with the retention only of those laws that had proved most practical and just was responsible, but it should be noted here that in the Code Napoleon, the fourteen causes for disinherison enumerated by Justinian in his Novel 115 were separated, the right to disinherit being eliminated therefrom; the right to have an heir declared to be unworthy to inherit for some of the causes originally given for disinherison being instituted therein.
 

 In Spain, due to specific provisions in the codes from as early as 693 A. D., the jurisprudence is uniform as to the manner in which disinherison may be revoked. In Book 4, Tit. 9, L. 2 of the Fuero Real, we find the provision in the following words: “ * * * Should the father or mother disinherit his or her child, grandchild or great grandchild, for one of the causes hereinabove mentioned, and thereafter he or she forgives the offense, then the disinherited child shall inherit again as before.” The present Spanish Civil Code, which abrogated all previous codes, contains in substance this same provision.
 

 The right to disinherit a child for marriage during minority without paternal consent is not to be found among the fourteen causes in Justinian’s 115th Novel. This cause was first added in France in
 
 *140
 
 1556 by an ordinance, attributable by the legal historians and commentators to a personal whim on the part of Henry II. It was not adopted by the Spanish law until the Pragmatic Sanction of D. Carlos III, in 1778.
 

 From Pothier, conceded to be one of the most eminent of all of the commentators on the Civil Law, we have the following comment on the right to disinherit and its revocation under the Roman law and the French law- prior to the adoption of the Code Napoleon:
 

 “Under the Roman law, disinherison could only be revoked by a testament which revoked the former one which contained the disinherison; that was the result of the principles of Roman law whereby a testament can only be revoked by another testament and that a person cannot dispose of his estate, make a donation or cancel it except by testament;
 
 testamentum rumpitur per aliud testamentum aeque perfectum; haereditas nec dari, nec adimi potest nisi testamento:
 
 these principles are not admitted by our law; this is the reason why disinherison may be revoked by the bare and mere volition of its author.
 

 “If the one who makes a disinherison declares afterwards by its testament, or by any other act, that he forgives his son, this act is equal to revocation of disinherison.
 

 “It is not even necessary that a written act be drawn up; it is sufficient that the disinherited be able to prove that the testator has shown signs of reconciliation; vie., if he has left him stay at his house or if he has allowed him to make more frequent visits.
 

 “The injury is so much presumed to be forgiven that no credence would be given to a declaration, made afterwards by the father in his testament, that in receiving his son in his house he did not intend to revoke the disinherison. * * * ” Vol. 21, “Traité des Successions,” Chapter 1, Section II, Article IV. (Italics ours.)
 

 The theory of this effect of reconciliation on revocation is explained more in detail by Jean Marie Ricard in his “Traité des Donations Entre Vifs et Testamentaires,” as follows:
 

 “We have said, and it is the truth, that the effect of disinherison is odious and hence it is easily removed by the reconciliation of the son with his father; it is a thunderbolt which is only preserved by the flash of anger; so much so that as soon as the tempest subdues and the father looks at his son once with a serene face all the clouds are scattered, he is presumed to have forgiven the past and to have wiped away his angry feelings * * * This is so very true that once the offense of the son has been wiped away by the forgiveness, the father cannot rely upon it any longer to let subsist the disinherison which he made and still less to make a new one * * *
 
 And so we see that although the causes of disinherison are quite ample, they rarely have their effect in execution;
 
 the traces of nature cannot be wiped away and disinherison, which amounts to the cutting off of a member of the family by way of fiction, through the abdication which a father makes of his son, suffers a perpetual
 
 *142
 
 opposition which emanates from the truth. And so,
 
 the law of nature is stronger than the civil law and if sometimes precedence is given authority of the latter, to support the former, rigor then prevails over equity and fiction over truth
 
 * * Vol. 1, 3rd Part, Chapter VIII, Section IV, No. 963, p. 627. (Italics ours.)
 

 For other French authorities on this same subject matter, see:
 

 (1) “Traité Elémentaire de Droit Civil,” by Planiol, Vol. I, Section 28, p. 22; Section 1078; and Vol. Ill, Chapter 3, Sections 1733 and 1734. (2) “Le Droit Civil Frangais,” by Aubry and Rau, Vol. Ill, Section 462, at page 113. (3) “Le Droit Civil Frangais,” by Toullier, Vol. I, No. 618. (4) “Répertoire de Jurisprudence,” by Merlin, Vol. VI, Section 3. (5) Vol. IV of the “Encyclopedic Méthodique,” p. 428. (6) Vol. 14 of Laurent’s Work, Section 270, at page 293. (7) “Explications Théoriques et Pratiques du Code Napoléon” by Marcadé, Vol. Ill, Section 707, at page 584. (8) “Cours de Droit Frangais” by Duran-ton, Vol. 8, Section 561, at page 633. (9) Tome VI, Journal des Audiences du Parlement, pp. 167 — 173. (10) Vol. Ill of the “Continental Legal Series,” Section 470 at p. 660, an article entitled “A History of French Private Law,” by Jean Brissaud. (11) Vol. Ill, “Cours de Droit Civil Frangais,” by Colin and Capitant, Section 610. (12) “De Conjecturis Ultimarum Voluntatum,” by Frangois Mentica, Book 3, Title 11, Section 44. (13) "Traité des Testaments” by Furgole, Vol. Ill, No. 162 and 168. (14) “Traité des Successions” by Denis Lebrun, Book 3, Chapter X, Section 4. (15) “Dictionaires des Arrets ou Jurisprudence Universelle des Parlements de France et autres Tribunaux,” Vol. Ill, under the title “Exhérédation par Marriage.”
 

 In Spain the commentators reach the same conclusion. See, Don Jose Maria Manresa y Navarro, “Comentarios al Codigo Civii Español,” Vol. VI, pp. 647-648, and “Diccionario de Legislación y Jurisprudencia,” by Joaquin Escriche, at page 1483 of the 1868 edition.
 

 . In the early eighteenth century Louisiana was governed by a military commandant. It was under Crozat’s grant from France in 1712 that the Civil Law of France and the Custom of Paris were introduced. As pointed out above, it was under these Customs that disinherison could be revoked by a reconciliation. The French system of law became so thoroughly established in the territory that when Spain took over the colony in 1769 General O’Reilly found it difficult, in fact, almost impossible, to substitute therefor the laws of Spain. The result was a distinctive system of law peculiar to Louisiana, reminiscent of a merger of the laws of Spain and of France. Napoleon was also confronted with two systems of law when he prepared to draft his code. This code had just appeared in France when the Louisiana colony again changed hands in 1803 and became a part of the United States. So tenaciously did Louisiana cling to her old system of law, however, that, despite strenuous efforts to introduce the common law of England which prevailed in all of the other states of the Union, the compilers of the laws in effect in Louisiana found a ready model
 
 *144
 
 for the modernization and ' codification of these old laws in the Code Napoleon. Consequently, although they patterned the Code of 1808 on the Code Napoleon, in a manner similar tp that in which Napoleon had used the Justinian codes and novels, they saw fit to incorporate therein the right to disinherit which had originated in the Roman law, to add thereto the cause which had crept into the laws of France and Spain with reference to the marriage of a minor and via these two countries into Louisiana, and to treat the causes of disinherison separately, as had been done in the Code Napoleon by the institution of the provisions with reference to unworthiness after the silent repeal of the provisions relative to disinherison.
 

 Two causes for disinherison were eliminated when the Code of 1825 was drafted, but otherwise these provisions are identical in the Codes of 1808, 1825, and 1870.
 

 . The legislative body specifically provided for the repeal of “the Spanish, Roman and French laws * * * in force in this State when Louisiana was ceded to the United States,” upon the promulgation of the Code of 1825, but only two years thereafter, this court, passing upon a question presented for the first time, said: “We know of no question better settled in Spanish jurisprudence, and what is settled there, cannot be considered as unsettled here. The jurisprudence of Spain came to us with her laws. We have no more1 power to reject the one than the other. The people of Louisiana have the same right to have their cases decided by that jurisprudence, as the subjects of Spain have, except so far as the genius of our government, or our positive legislation, has changed it.” Saul v. His Creditors, 5 Mart.,N.S., 569, at page 607, 16 Am.Dec. 212. In 1839 Justice Martin as the organ of the court again emphasized that the laws repealed by the promulgation of the Code of 1825 were only the positive written statutes of France, Spain, and Rome, adding that “ * * * it is the daily practice in our courts to resort to the laws of Rome and France, and the commentaries on those laws, for the elucidation of principles applicable to analogous cases.” Reynolds v. Swain, 13 La. 193.
 

 Thus it may be seen that while this court is not specifically instructed by the legislature to follow the jurisprudence found in Rome, Spain, and France on controversial questions before us for decision the first time, the settled principles of those countries are most persuasive assistants in the solution of problems presented under the provisions of our Civil Code which were either adopted from their laws or passed upon by their jurists.
 

 As we pointed out when this case was previously before us (Succession of Lissa, 195 La. 438, 196 So. 924), the articles of the Code on disinherison have rarely been availed of by parents. In no instance have they been invoked by children for the disinherison of their parents. From a review of the few reported cases we find that although the identical issues raised here were never questioned or passed upon in any of those cases, the proof offered by heirs to establish the facts on which the disinherison was founded was invariably by parole
 
 *146
 
 testimony, although there is no such provision in the code.
 

 The causes for which disinherison is authorized under our code and the laws of other countries are substantially those found in Justinian’s 115th Novel, in which novel are also found the reasons for which an heir can be declared to be unworthy to inherit. Prior to the adoption of the Code Napoleon in France, the causes for disinherison and the causes of unworthiness are likewise treated under the branch of the law dealing with the rights of a parent to disinherit his child. In our civil codes they are treated separately.
 

 We can understand that exclusion from inheriting because of unworthiness may exist independent of the right to disinherit, as happens to be the case in France under the Code Napoleon, which expressly provides for the former but silently repeals the latter by failure to make provision therefor, but these two are so closely related that we can see no reason for their separate treatment in our code except, possibly, in the case where a person, murdered by his heir, dies before he has an opportunity to disinherit him. Yet we find that if the parent does not die from the attempt on his life by his child, the Code in Article 975 provides that a suit cannot be maintained against such child if there is a reconciliation or pardon of the injury by the injured parent. In the case just mentioned, if the father dies “without disinheriting” his son, “he will be considered as having forgiven the injury, and the child cannot be deprived of the succession of his father on account of unworthiness.”
 

 We cannot conceive of any sound reason or justification for permitting forgiveness or condonation to wipe out the effects of unworthiness unless they are likewise permitted to wipe out the causes for disinherison, particularly since the two most grievous causes for disinherison are, in effect, the same as two of the .three causes of unworthiness, and the .other eight are so much less reprehensible, as, for example, where a child raises his Fand to strike his parent but repents and does not do so, or where a minor marries without the consent of his or her parent. To so interpret these articles we would have to hold that a person could not be declared unworthy even though he had attempted to take the life of the one from whom he is inheriting if he has been forgiven by that person, but he would not be permitted to prove that same forgiveness, and, consequently, deprived of his legitime, if the same person, although forgiving the attempt on his life, were to later disinherit the heir who made the attempt on his life. Such an anomalous situation could never have been intended by the lawmakers in adopting these articles. The law with reference to disinherison and the law with reference to unworthiness are “in pari materia” and we are expressly instructed by the Revised Civil Code to construe such laws with reference one to the other in order that “what is clear in one statute may be called in aid to explain what is doubtful in another.” Article 17.
 

 It is our opinion, therefore, after a most thorough study of the entire subject matter, that these articles were intended by the legislators to be treated in the light of
 
 *148
 
 the jurisprudence in the countries from which they were derived. It necessarily follows that whenever the injury which gives rise to the disinherison is forgiven by the injured person, the cause for the disinherison is defeated or stricken down, and such forgiveness may be established by parole testimony. To hold otherwise would be unreasonable and illogical, as just demonstrated in the case where the child, attempting .to take his father’s life, is nevertheless permitted to inherit from him if the father dies without disinheriting him, the cause of his unworthiness being presumed forgiven; yet the same child, although forgiven for .the offense by the father during his lifetime, would be prevented from inheriting if he subsequently displeased his father and was disinherited by him for the attempt on his life because of his inability to prove that forgiveness. And for another example: If a child marries without the consent of the parents, which is another of the just causes for disinherison, and subsequently the parents do give their consent by way of condonation, can it be said that the parents, later becoming displeased with the child for some other personal reason or because of mental ill health, can logically or for just cause punish the child by depriving him of his rightful legitime?
 

 The trial judge in his written reasons for judgment said: “The preponderance and weight of the evidence show that Mrs. Spiro had forgiven her daughter Mrs. Adele Mathe.” We think the record unmistakably bears him out in this respect.
 

 The testimony shows that the defendant’s mother visited defendant shortly after the marriage and continued to do so over a period of years, or until she became incapacitated. She spent as much as a week at a time with Mrs. Mathe, even taking a trip, financed by Mr. Spiro, with her to the Chicago World’s Fair as late as 1932. The defendant and her family visited in the home of Mr. and Mrs. Spiro in New Orleans on a number of occasions at the invitation of Mrs. Spiro and also at the summer home of the family on the Gulf Coast. Defendant’s mother visited her at the birth of her first child and also had one of her brothers visit her. When the second child, a son, was born, Mrs. Spiro (although Mr. Spiro did not attend the ceremony) made all arrangements for the child’s circumcision (the family being strict orthodox Jews), and the ceremony was held at the home of the defendant’s parents, Mrs. Spiro, together with defendant’s father, acting as the child’s sponsors and presenting to it the token or gift customary at such ceremonies. When this child subsequently died, she attended the funeral.
 

 The record further shows that the defendant attended a celebration given at the home of her parents on the confirmation of her youngest brother, Joseph. On the same day both of her parents returned with her to her own home to attend the party celebrating the confirmation of her eldest daughter. In addition to these celebrations, the defendant attended a family party given at Club Forest by her brother Joseph, and also the fiftieth wedding anniversary celebration of her mother and father held at Arnaud’s Restaurant in 1933 and financed jointly by defendant and her sister, Mrs. Pick.
 

 
 *150
 
 According to these facts, therefore, when Mrs. Spiro executed her will in April of 1911, the cause upon which the disinherison of defendant was based had long since been forgiven. In the face of her demeanor after defendant’s marriage, her action in disinheriting Mrs. Mathe cannot be satisfactorily explained unless it was because she was dissatisfied with the defendant when she became reconciled to her husband against whom she had, in the January preceding the execution of the will, filed suit for separation on the ground of cruel treatment.
 

 The learned trial judge, however, in analyzing the testimony that he had allowed to be introduced, declared that the fact that the father had taken an interest in the defendant at the time she was having marital trouble, as well as the interest taken in her financial affairs, and that he took her out to lunch, did not prove that he forgave his daughter or became reconciled to the marriage when taken into consideration with the further facts that in addition to the will of 1911, in which he disinherited the defendant, he made three other wills shortly before his death, in all of which he repeated his provisions relative to her disinherison, as well as the fact that he joined his other children in an effort to have defendant’s disinherison from her mother’s estate enforced.
 

 The testimony on this aspect of the case is greatly in conflict. It is .true the record shows the father did not as readily forgive his daughter’s marriage as did his wife, but he, we believe, did become reconciled to his daughter’s marriage during the period of approximately thirty years intervening between 1905, the year of her marriage, and 1934, when she again lost the good grace of her father because of some difficulty had with her sister, Mrs. Ruby Spiro Pick.
 

 The record shows that when the defendant left her husband in January of 1911, her father took her to his own attorney, who filed the separation suit. Before .the case went to trial the defendant became reconciled to her husband. It was soon thereafter that the defendant’s father on April 17, 1911, executed a will identical with the one executed by her mother, in which he disinherited her. However, we find that her father thereafter financed both the defendant and her husband in their purchase of the first property belonging to the community by lending them 90% of the amount needed for the purchase at a smaller rate of interest than was customary. In 1933, when the defendant left her husband, her father again came to her assistance and he, together with, her brother Edward, so manipulated her affairs that she acquired her husband’s interest in the community, the father advancing the money for the final settlement.
 

 It appears from the record that when defendant’s husband embraced Judaism in order that his daughter might be confirmed-in that faith, such evidence of opposition on the part of Mr. Spiro as had existed to Mrs. Mathe’s marriage seemed to disappear. He became more intimate with, her — so much so that he was seen lunching with her at Arnaud’s and Morrison’s on numerous occasions, sometimes alone with
 
 *152
 
 Mrs. Mathe and at other times with her children or her sister, Mrs. Pick. She visited him at his office on any number of occasions, one time in particular for the purpose of consulting him about the purchase of an automobile. She drove him around at times when he was attending to his business. He kept her money in his safety deposit boxes for her and kept an account thereof. The record also shows that at the family celebration given by her brother at Club Forest, her father danced with her. This close relationship appears to have continued until the time when the defendant had a disagreement with her sister, whose influence on her father was very apparent from the evidence in the record.
 

 In,addition to the four wills above referred to, it appears that Mr. Spiro executed another will on May 3, 1933, as evidenced by the inscription in his own handwriting “Last will of L. Spiro, May 3, 1933,” on an envelope found in one of his bank boxes. It is the contention of the defendant that by this will the father in all probability revoked his disinherison of Mrs. Mathe because he was friendly with her at that time. This will, however, was never found, and-we cannot conjecture as to its contents, even though the fact that Mrs. Pick on the day following the funeral of her father visited all of his bank boxes and withdrew therefrom papers, the contents of which she could never satisfactorily explain to the bourt, is, to say the least, in the light of the foregoing facts, of a highly suspicious nature.
 

 For the reasons assigned the judgment of the lower court is annulled and set aside and it is hereby ordered and adjudged that there be judgment against the plaintiffs and in favor of the defendant, Mrs. Adele Spiro Mathe, disallowing her disinherison and decreeing her to be entitled to her share of the, estates of her father and mother; plaintiffs to pay all costs.
 

 O’NIELL, C. J., and LAND, J., absent.