413 So.2d 936 (1982)
In the Matter of the SUCCESSION OF Ernest L. CHANEY, Sr.
No. 14688.
Court of Appeal of Louisiana, First Circuit.
April 13, 1982.
Rehearing Denied May 25, 1982.
*937 Robert E. Kleinpeter, Baton Rouge, for plaintiff-appellant Ernest L. Chaney, Jr.
Mary Olive Pierson, Baton Rouge, for defendant-appellee Willis I. Chaney, Sr. and Edith Chaney Hudson.
Before COVINGTON, COLE and WATKINS, JJ.
COLE, Judge.
The issues presented here are whether or not defendants have proven the facts upon which plaintiff's disinherison was based, and if so, whether or not plaintiff has proven the testator forgave him.
The facts are as follows. Ernest L. Chaney, Sr., (herein referred to as the testator) died on February 14, 1980, and left a statutory will wherein he disinherited his son, Ernest L. Chaney, Jr. (herein referred to as plaintiff). He stated in the will the disinherison was based upon La. Civil Code art. 1621(1) and (2) which reads as follows:
"The just causes for which parents may disinherit their children are ten in number, to-wit:
1. If the child has raised his or her hand to strike the parent, or if he or she has actually struck the parent; but a mere threat is not sufficient.
2. If the child has been guilty, towards a parent, of cruelty, of a crime or grievous injury."
The will, dated September 21, 1979, executed before a notary and two witnesses, left 1/18th of the estate to Gail Chaney (a granddaughter) and the remainder to his other children, Willis I. Chaney, Sr., and Edith Chaney Hudson. The will read in pertinent part as follows:
"On numerous occasions over the previous years, Ernest L. Chaney, Jr. has *938 cursed me, ordered me from his home and struck me requiring that law enforcement officers be called. More specifically and on February 13 and 14 of 1977, Ernest L. Chaney, Jr. cursed me, ordered me from his home in Mississippi and told me he did not desire to care for me any longer and would prefer if I went back to Baton Rouge. In addition to this, on the 20th day of July, 1979, Ernest L. Chaney, Jr. and his sons cursed and struck me, causing injuries to me, for no reason whatsoever; also during the lifetime of my deceased wife and his mother, Ernest L. Chaney, Jr. was guilty of cruelty toward her, struck her on many occasions and cursed her violently. Ernest L. Chaney, Jr. has been guilty of all of this cruelty on numerous occasions inspite of my efforts and the efforts of my deceased wife to be kind to him, provide him with all of the necessities of life and provide him with guidance in raising his family. It is my desire that he be disinherited from my estate and deprived of his forced legitime."
The will was probated by the district court. Plaintiff, Ernest Chaney, Jr., then filed suit to have his legitime enforced and named as defendants Willis Chaney, Sr., (individually and as the executor of the Estate of Ernest L. Chaney, Sr.), and Edith Chaney Hudson. Prior to trial the parties stipulated to certain facts such as the date of the testator's death, the identity of the heirs, and most importantly, the testator "had the legal mental capacity to execute the will" dated September 21, 1979. Evidence presented at trial related mainly to the alleged striking incident of July 20, 1979.[1] After hearing the evidence the trial court rendered judgment in favor of the defendants and upheld the validity of the disinherison portion of the will. Plaintiff then filed this appeal.
In written reasons for judgment the trial court noted under Civil Code art. 1624 the testator must state in his will the reasons for the disinherison and the other heirs must prove the facts on which the disinherison is founded. Therefore, the defendants have the burden of proving Ernest Chaney, Jr. either struck the testator or was guilty of other acts of cruelty. Once either allegation is proven the disinherited heir bears the burden of proving forgiveness or reconciliation so as to revoke the disinherison. Otherwise the disinherison will be upheld.
Plaintiff complains of four errors committed by the trial court. First, plaintiff contends because the testator listed several reasons for the disinherison, the other heirs must prove the facts to support each and every reason in order to uphold the disinherison provisions. This argument is totally without merit. La. Civil Code art. 1621, cited above, provides ten causes for which parents may disinherit their children. The testator singled out two causes and then recited facts to support both. Proof of either one of the causes is sufficient.
We agree with defendants-appellees this case is no different from a tort action wherein the plaintiff alleges several acts of defendant's negligence have caused his injuries. If plaintiff can prove any one of the acts alleged he has sustained his burden of proof. Similarly, a plaintiff in a suit for separation from bed and board might allege several grounds under La. Civil Code art. 138. The plaintiff will prevail if he or she is able to prove any one of the grounds alleged. A plaintiff who out of abundance of caution urges multiple grounds is not penalized by having to prove each and every one of them.
The trial court concluded the heirs had proven by a preponderance of the evidence plaintiff struck his father on July 20, 1979, and proof of this act was sufficient to uphold the disinherison provisions. We agree.
*939 Second, plaintiff contends the trial court erred in granting greater weight to the testimony of the defendants and their witnesses rather than the testimony of the plaintiff and his witnesses. The following facts were established at trial and are largely undisputed. The testator, age 89, had been residing alternatively at the home of each of his three children, spending approximately two weeks with each. At the time of this incident the testator was residing with plaintiff at his home in Mississippi. On the night of July 19, 1979, plaintiff awakened and discovered the testator had left the house. Plaintiff's two sons got a flashlight, searched the area and found the testator lying on the ground in the back yard, about six feet from a barbed wire fence. Plaintiff called Willis at approximately 1:00 A.M. and shortly thereafter plaintiff, his wife and son Wade delivered the testator to Willis' house in Baton Rouge.
There was conflicting testimony as to the nature of the phone conversation. Myra Chaney, Willis' wife, stated she answered the phone and could hear "papa" (the testator) in the background saying he wanted Willis to come get him. Willis testified plaintiff called and said he couldn't put up with the testator any longer and was going to bring him to Baton Rouge. Plaintiff testified he called Willis only at the testator's request although when Willis was reached the testator refused to talk to him. Plaintiff stated he then told Willis it would be best if the testator came to Willis' house that night.[2]
Testimony also conflicted as to the circumstances surrounding his arrival at Willis' house. Willis and his family testified there was much yelling and commotion by the testator and the plaintiff, and the testator said he had been beaten up by plaintiff and his sons. Plaintiff and his wife both denied any ruckus occurred and knew nothing of the testator's accusations that he had been beaten up.
Of primary importance is the testimony concerning the testator's physical condition when he arrived at Willis' house. Willis stated his father had a black eye, was bruised and his nose, arms and legs were "skinned up." Blood was coming through his shirt. Myra Chaney, Willis' wife, stated the testator's face was bloody, his left eye was black and he had a skinned spot on his head. She said his shirt and pants were stained with blood that seemed to have been coming from his upper right arm and his lower right leg.
Willis Chaney, Jr., Willis' son, testified his grandfather (the testator) was bruised a little bit and had blood on his pants. Willis' twelve year old granddaughter, Cherry Barton, was visiting at her grandfather's house the night of the incident. She did not leave her bedroom that night but saw her great grandfather the next morning. She described him as having a black eye, a cut on his leg and bruises on his arms.
Ms. Helen Pope, administrator of the Golden Age Nursing Home, was called by the defendants to testify concerning certain nursing home records. The records were admitted under La.R.S. 13:3714 which is an exception to the hearsay rule. Ms. Pope read from the records a notation made by a nurse who examined the testator upon his admission to the nursing home on July 20, 1979. The record reads as follows:
Admitted white male, age eighty-eight, to Room 417A. Ambulatory with cane. Alert, cheerful. Diagnosis: ASHD, diabetic, senility, peripheral vascular disease, multiple abrasions and bruises noted over body, small laceration right hand, abrasion right lower arm, left upper arm bruised, left eye and nose bruised, small abrasion on bridge of nose, left side of middle back bruised, abrasions on right shin and left shin, pedal edema below the knee, dark purple and hard. Skin very dry, especially right leg and ankle. Left hand one finger one-half amputated. Hearing aid, right ear. Dentures, top and bottom plates. To dining room for *940 lunch, appetite good. Pocket knife removed from patient's possession, will give to family. Dr. Bergeron notified of patient's admittance. New orders.
Dr. Cecil Bergeron treated the testator (at the nursing home) about ten days later and he testified his notes showed he found several abrasions on the testator's body, including his arm and his face, all in the healing stage. He noted the testator also had leg ulcers which were not a result of trauma.
Plaintiff and his two sons testified and denied striking the testator. Their description of the testator's physical condition was quite different from that of the defense witnesses. Plaintiff stated the testator had abrasions but no black eye, no cut on the nose and was not bleeding. He stated his father had "skinned himself up," possibly on the steps of plaintiff's house or when he fell in the yard. Plaintiff's wife, Billie Chaney, stated she saw no abrasions on the testator's face nor did she see any blood. Elvin Wade Chaney, plaintiff's son, testified he found his grandfather lying in the yard on the specified night. He said he had no new marks or injuries at all and had no marks on his face. Clarence Chaney, plaintiff's other son, testified he saw no injuries on his grandfather's face but did notice some scratches on his hand.
We note there were several minor inconsistencies in the testimony of witnesses for each side. Willis and his wife testified they took the testator to Dr. Jere Melilli the next day and Dr. Melilli examined the testator and recommended he enter the nursing home. Dr. Melilli stated he did not recall seeing the testator that day but did remember talking with family members and providing forms necessary for his admittance to the nursing home. An inconsistency in the testimony of plaintiff's witnesses arose when plaintiff testified his son Wade had spent several nights with the testator at the hospital. Wade stated he had visited his grandfather only once in the hospital and had never spent the night.
The trial court noted other inconsistencies in plaintiff's and his witnesses' testimony, concerning the physical description of the testator on the night in question and concerning the frequency of visits made by the plaintiff and his wife. The trial court then stated, "Considering these differences, this court feels more weight should be placed upon the testimony coming from the executor and his witnesses." The court then concluded the defendants had shown by a legal certainty that decedent was struck by plaintiff on July 20, 1979, and therefore the disinherison provisions were valid and should be upheld.
We agree with appellant's contention there is no direct evidence establishing plaintiff struck the testator. But as the trial court noted, citing Morales v. Houston Fire and Cas. Co., Inc., 342 So.2d 1248 (La. App. 4th Cir. 1977), writ refused 1977, causation can be proved by circumstantial rather than direct evidence. The Morales court stated, at page 1250:
"The ultimate question is the preponderance of all evidence. Proof, whether by direct or circumstantial evidence, is sufficient to constitute a preponderance when the proof, taken as a whole, shows that the fact or causation sought to be proved is more probable than not."
After reviewing the record we agree the circumstantial evidence, taken as a whole, showed more probably than not the plaintiff struck the decedent. It is well established that as an appellate court, we are limited in our assessment of credibility of witnesses. Where evidence is conflicting we should not disturb the trial court's reasonable evaluation of one set of witnesses as credible and its consequent rejection of testimony of the opposing set of witnesses; nor should we disturb the trial court's reasonable factual inferences drawn from testimony found by it to be credible. Billiot v. Bourg, 338 So.2d 1148 (La.1976).
We regret we are limited to the "cold record" in this aspect. But it is logical we defer to the judgment of the trial court, unless manifest error is noted, because the trial court is in the position to assess the demeanor and the attitudes of the witnesses, *941 first hand. This first hand observation means the trial court is well equipped to make the difficult decision as to which witnesses are speaking truthfully.
Plaintiff's third assignment of error is that even if the evidence proved he struck his father, his father forgave him so the disinherison provision has no effect. Successions of Lissa, 198 La. 129, 3 So.2d 534 (1941), established that when the evidence shows the testator has forgiven the disinherited heir, the disinherison provisions of the will are null. Plaintiff stated he visited his father in the hospital after his second surgery[3] and later at the nursing home. On the occasions when the testator was alert he seemed glad to see plaintiff and inquired about a crop he had helped plant. Plaintiff admitted he had not seen or inquired about his father from the time the testator was admitted into the nursing home in July until the time of his second operation, which was sometime after October 18, 1979. He stated Willis had promised to notify him of his father's condition but he learned of the second surgery only because a distant relative so informed him.[4] When asked why he didn't make the inquires himself (rather than wait to be informed) he said he had wanted to avoid any controversy about the way his father was "raising sand the morning I took him down there." The court refused to deem this limited contact to mean the testator had forgiven the plaintiff, based partially on the evidence showing the testator had been semicomatose on many occasions after his surgery.
We find no manifest error in the conclusions of the trial court. The evidence offered by plaintiff does not establish his father forgave him for the striking. The jurisprudence does not set forth guidelines for determining when forgiveness has been established,[5] therefore we have no "definition" as to what constitutes forgiveness. Yet we feel quite comfortable in saying there must be some affirmative action by the testator to show he has in fact forgiven the disinherited child. A merely passive action such as the testator allowing his son to visit him in a nursing home is not an act showing forgiveness. The record establishes the testator's mental and physical condition declined seriously after the second surgery and although we are not denying he had lucid intervals, we feel his general ill health would permit him to do little more than accept his son as a visitor.
Finally, plaintiff contends the court erred in rejecting plaintiff's claim for his legitime because the record shows "the testator had insufficient control over his functions from July 1979 such that no credibility should be given to any statements made by the testator concerning reasons for his son's disinheritance." We reject this argument because the parties stipulated the testator had the mental capacity to execute the will on the date of execution.
For these reasons, the judgment of the trial court is affirmed. Appellant is to pay all costs.
AFFIRMED.
NOTES
[1] Although the will alleges another act of cruelty which occurred in 1977 the testimony concerning this incident is irrelevant. We so conclude because the record indicates the testator donated real estate to plaintiff in May of 1979. This act of donation represents forgiveness for any acts occurring prior to that date.
[2] Plaintiff and Willis both testified they had planned to have the testator admitted into a nursing home on July 20 and were going to meet at Willis' house in order to do so.
[3] The testator was admitted to Dixon Memorial hospital on October 18, 1979, for an appendectomy. He improved somewhat after the surgery but several days later required another operation to repair the stitches and to treat infection. He was discharged and returned to the nursing home but reentered the hospital on November 8, 1979, January 6, 1980 and February 9, 1980. He died there on February 14, 1980.
[4] Willis testified his father had instructed him not to inform plaintiff of his failing health because the testator did not want to see plaintiff.
[5] Successions of Lissa, supra, discusses forgiveness but the facts of that case show the testator and the disinherited child maintained a close and loving relationship for years before the disputed will was executed.