548 So.2d 37 (1989)
James M. AMBROSE SUCCESSION, et al., Plaintiffs-Appellants,
v.
Dorothy AMBROSE, Defendant-Appellee.
No. 20482-CA.
Court of Appeal of Louisiana, Second Circuit.
June 28, 1989.
*38 Snellings, Carso & Kennedy by Robert S. Kennedy, Jr., Monroe, for plaintiffs-appellants, Loyce Ambrose Forsythe and Karen Ambrose Richoux.
Levy, James & Shealy by Robert W. Levy, Ruston, for defendant-appellee, Dorothy Dugdale Ambrose.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
SEXTON, Judge.
This is an appeal by two daughters against decedent's spouse seeking to invalidate their disinherison by their father. We affirm.

FACTS
Decedent, James Ambrose, who died on February 16, 1987, left a statutory will dated November 15, 1985, in which he sought to disinherit his daughters, Karen Ambrose Hagan Richoux and Loyce Ambrose Forsythe. The disinherison was based on three of the grounds listed in Louisiana Civil Code Article 1621, namely, (1) when a child has been guilty of cruelty to a parent, (2) when a child uses coercion or violence to hinder a parent from making a will, and (3) when a child fails to communicate with a parent for a period of two years after the child reaches majority, without just cause. Mr. Ambrose asserted in the will that his daughter Loyce came by his home and demanded that he make a will authorizing her to manage his separate property. When he refused to do so, she threatened to make his last years miserable. She cursed the decedent and his wife and insulted the decedent, according to his allegations. When asked to apologize, she refused. The parties have not been in contact since 1984.
The testator also asserted that his daughter Karen (also known as Jan) refused to let him see her children and on one occasion became violent and threw her parents out of her home. She has not had contact with the decedent since October 5, 1984. When Mr. Ambrose was hospitalized for lung cancer in 1984, she refused to be present or help her father.
The trial court determined that the facts asserted by the testator were sufficient to raise a rebuttable presumption under LSC.C. Art. 1621 that the facts set out in the act of disinherison supported the causes. The court found that the heirs did not carry their burden of rebutting the presumption as "their entire defense consisted of denials, and the preponderance of the evidence *39 supported rather than refuted the causes for disinherison listed in the will."
The daughters appeal the judgment disinheriting them alleging that the trial court was clearly wrong in (1) finding that the specific allegations contained in the decedent's will were sufficient as a matter of law to justify the disinherison, and (2) finding that the trial court erred in failing to admit evidence of forgery by the decedent's widow in connection with the simulated sale of estate property as impeachment evidence in order to prove that the disinherison was part of a larger scheme to prevent the daughters from obtaining their inheritances.
The current total scheme of disinherison is to be accomplished by one of the forms prescribed for testaments. LSA-C.C. Art. 1618. The disinherison is to be by name, expressly done and for a just cause. LSC.C. Art. 1618. The current causes for disinherison are only those twelve specifically listed. LSA-C.C. Arts. 1620-1621. There is a rebuttable presumption that the facts set out in the act of disinherison are correct. LSA-C.C. Art. 1621. The forced heir has the burden of proving that the cause stipulated for disinherison did not exist or that he was reconciled with the testator after the alleged act at issue. LSA-C.C. Art. 1624.
In the instant case, there is no contest over the form of the disinherison, and it is clear that the causes listed in the instant testament fall within those in LSA-C.C. Art. 1621, which reads in pertinent part:
Art. 1621. Children, causes for disinherison by parents
The just causes for which parents may disinherit their children are twelve in number. There shall be a rebuttable presumption as to the facts set out in the act of disinherison to support these causes. These causes are, to wit:
. . . .
2. If the child has been guilty, towards a parent, of cruelty, of a crime or grievous injury.
. . . .
8. If the child used any act of violence or coercion to hinder a parent from making a will.
. . . .
12. If the child has known how to contact the parent, but has failed without just cause to communicate with the parent for a period of two years after attaining the age of majority, except when the child is on active duty in any of the military forces of the United States.
The will sets forth the following facts with regard to Loyce.
Loyce Ambrose Forsythe, in 1982, came by my home and demanded that I make a will leaving her in charge to manage my separate property. I refused to do so, and she threatened to make my last years on this earth quite miserable. She has cursed me and my wife in person and over the phone, despite our repeated requests that she not do so. The last time being June, 1982, after I returned from the hospital. She called me on the phone and insulted me and cursed me until I began to cry. On September 4, 1984, I was very ill in Lincoln General Hospital, suffering from lung cancer. I called my daughter Loyce and asked her to apologize for things that had taken place in the past and to come to see me while I was in the hospital. Her response was that she would die and go to hell before she would apologize to me or her mother. I have not seen or heard from her since this incident. Loyce Ambrose Forsythe has been guilty of all of this cruelty on numerous occasions in spite of my efforts to be kind to her. It is my desire that she be disinherited from my estate and deprived of her forced legitime.
The will alleged the following facts with regard to Karen:
On numerous occasions over the previous years, Karen Ambrose Hagan has refused to allow me or her mother to see her children, Darrin and Stephanie. On November 25, 1983,[1] we went to her *40 home in LaPlace, Louisiana, to take the children their Christmas presents. She became violent and we were practically thrown out of her home. She has cursed me a number of times, both in person and over the telephone. She has not called us or had any contact with us since October 5, 1984. During September of 1984 when I was hospitalized for surgery for lung cancer, she refused to be present and offered no help in caring for me after the surgery. Karen Ambrose Hagan has been guilty of all of this cruelty on numerous occasions in spite of my efforts to be kind to her. It is my desire that she be disinherited from my estate and deprived of her forced legitime.
We agree with the trial court that the facts alleged by Mr. Ambrose with regard to Loyce Ambrose Forsythe were sufficient to qualify as an act of coercion which hindered him from making his will. We also agree that the alleged behavior of Karen Ambrose Hagan Richoux rises to the level of cruelty encompassed by LSC.C. Art. 1621(2). The statements that on one visit the daughter Karen "became violent" and practically threw her parents out of her home, that she cursed her parent over the telephone, and that she refused to assist her parent either during or after serious surgery are sufficient assertions of cruel treatment under the code article. See Matter of Succession ofChaney, 413 So.2d 936 (La.App. 1st Cir.1982), writ denied, 420 So.2d 449 (La.1982).
As we have determined that the facts alleged by Mr. Ambrose to support disinherison of both of his daughters are sufficient to fall within the pertinent provisions of LSA-C.C. Art. 1621, we now turn to the question of whether or not the daughters rebutted by a preponderance of the evidence the presumption that the causes asserted for their disinherison did not exist. LSA-C.C. Art. 1624. These questions are factual, and we find the determinations of the trial court are supported by the record and are not manifestly erroneous.
The evidence as it concerns Loyce reveals that she approached her father in 1982 and demanded that her father alter his will. At that time she threatened to make her father's life miserable if he failed to do so. This statement was overheard by Loyce's mother as well as a relative, Mrs. Barbara Smith, who unknown to Loyce, was in her parents' van. Loyce presented very little evidence to discredit the truth of the testimony of these two witnesses. By her self-serving testimony, she denied making these statements but offered no other evidence sufficient to indicate that the conversation did not in fact take place. The trial court specifically accepted the contrary evidence and we find no error. Since one of the causes for disinherison is found to exist, there is no need to evaluate the other asserted causes. Matter of Succession of Chaney, supra. The trial court finding with regard to Loyce is therefore affirmed.
The alleged facts with regard to Karen present a more difficult issue. The court determined that Karen was guilty of cruelty toward her father based upon the fact that she cursed her father on a number of occasions, she treated her father so badly when he visited her home that he felt unwelcome, she prevented her children from extended visits with her father, she refused to give her father her unlisted phone number, and she failed to visit her father when he was ill.
The allegations set forth by her father were somewhat different. He claimed that on numerous occasions she refused to allow him to see her children.[2] The will stated that he went to her home in LaPlace and she became violent and practically threw him out of her home, that she cursed her parents a number of times, and that she had not called or had contact with her parents since 1984.[3] Also, she refused to *41 be present and offered no help in caring for the father after the surgery.
There was testimony at trial which indicated that Karen (Jan) cursed her father on numerous occasions. Ray Hagan, Karen's ex-husband, testified that he heard Jan curse her father between the years 1981 and 1987. He stated, "She was very strong and adamant in the language she used." Mr. Hagan's present wife, Kathleen Hagan, testified that although she did not personally hear Karen curse her father, she did use profanity when she spoke of her father. Mrs. Ambrose, Karen's mother, testified that Karen cursed her father on many occasions. Additionally, the independent testimony of James Holtzclaw, a friend of the family who spent much time with Mr. Ambrose, indicated that he also heard Karen use profane language toward her father, especially on the occasion of Thanksgiving, 1982 when he accompanied the Ambroses to Karen's home. There was little evidence presented to indicate that Karen did not use profanity towards her father. Although Karen's son, Darrin, never heard his mother curse his grandfather, his testimony cannot be said to counteract the testimony of other witness, some independent, who heard the language when the evidence is viewed as a whole. We cannot find that the trial court erred in finding that Karen failed to rebut the presumption that she in fact regularly cursed her father.
The same is true with regard to the statements alleged by Mr. Ambrose that Karen made him feel unwelcome in her home on Thanksgiving of 1982 and that she failed to give him her phone number. There is no dispute in the record that Mr. and Mrs. Ambrose visited the home of their daughter on Thanksgiving of 1982. Likewise, the evidence clearly indicates that the circumstances surrounding the visit were strained. Mrs. Ambrose testified that from the very beginning of the visit she and her husband felt unwelcome. James Holtzclaw corroborated these assertions as he was present on this visit as well. Although Karen claims that she did not make her parents feel unwelcome, she admits that arguments took place as her parents requested that her boyfriend leave her house on Friday night and would not go to dinner with Karen if her boyfriend, now her present husband, came along.
The testimony of Karen's ex-husband and that of his wife indicated that Karen approached both of them after the episode and made statements to the effect that she told them (her parents) to "get [the] hell out of my house," and that she didn't want them in her house and didn't care if they ever came back. Karen's son, Darrin, although present during the visit, could offer little insight into the episode. This evidence as well demonstrates that Karen failed in her burden of showing that she did not make her parents feel unwelcome.
Relevant to the phone number, Karen testified that her parents were not given her new unlisted number. She felt that her parents knew where she worked and could contact her there.
Thus, in her testimony, Karen conceded the assertion. Relevant to the statements that Karen failed to visit her father when she was ill, Karen claims that she visited Mr. Ambrose before he was to have surgery in 1984. The surgery took place a few days later and she was unable to stay. There is evidence in the record that her car was repaired at the end of August and the beginning of September of 1984, the year of her father's surgery. Darrin also indicated that he remembered visiting his grandfather in the hospital once in 1982 or 1983. Ray Hagan, Karen's ex-husband, did remember some time when she did go to Ruston when her father was scheduled to have surgery.
Additional evidence, however, indicated that there were other occasions when Karen refused to visit her father in the hospital. When informed of her father's continuing illness by her ex-husband, she informed Mr. Hagan, "I'm sorry, but that's their problem. I don't have anything to do with them anymore."
Mrs. Barbara Smith witnessed Mr. Ambrose cry after speaking to Karen and asking her to come to the hospital. Tony Holmes, who stayed with Mr. Ambrose in *42 the hospital in 1984, also witnessed Mr. Ambrose crying after speaking with his daughter. Karen presented no evidence in explanation of these events. Therefore, although there are indications that on one occasion Karen may have visited her father, there is independent evidence to indicate that on separate occasions Karen failed to attend her father per his request. The evidence indicates that on at least two other occasions her father requested her presence while he was in the hospital, and all indications support the conclusion that she refused to visit him. Therefore, we cannot find that Karen rebutted the presumption that she failed to visit her father while he was ill in the hospital.
Finally, the trial court found that Karen failed to rebut the presumption that she prevented her father from extended visits with her children. However, Mr. Ambrose's allegation in this respect was that his daughter refused to allow him to see her children on numerous occasions. The evidence indicates that Karen visited north Louisiana four or five times a year before the problems with her father began. Although the children were allowed to visit the grandparents for extended periods of time before 1985, this ceased to be the case after numerous spats between Karen and her parents.
The evidence, however, indicates that the children were allowed to see their grandparents every time she was in Ruston, although the visits arose from Karen's visits with her sister and not with her parents. Additionally, the evidence shows that her parents were able to see the children on Thanksgiving of 1982. Loyce Ambrose indicated that her sister visited during 1983, 1984 and 1985, and the children's father brought them to north Louisiana in November of 1986, based upon Karen's permission. Darrin testified that he was allowed to visit his grandfather as recently as November of the year that he died. He indicated that on most holidays he was allowed to come up there and stay with his aunt and visit with his grandparents.
James Ambrose, the brother of Karen and Loyce, indicated that Karen's children did visit his parents when Karen would visit Loyce. Finally, Mrs. Ambrose admitted that Karen allowed the children to come and spend time with her and her husband but not for more than one-day visits. She admitted that Karen never visited more than twice every year, and that the visits with the children lasted generally no more than 30 minutes.
When all of the evidence is viewed in its entirety, we find that Karen has sufficiently demonstrated that she did allow her children to visit with their grandparents contrary to Mr. Ambrose's assertion. Although the weekly summer visits ceased, Karen has demonstrated that she did nothing to prevent the children from seeing their grandparents when she was in Ruston.
Although we determine that Karen rebutted the presumption that she failed to allow her children to visit her father, the remaining unrebutted allegations of fact amount to a level of cruelty by Karen towards her father sufficient to trigger the provisions of LSA-C.C. Art. 1621(2). The accumulated acts of constantly cursing her father, making him feel unwelcome in her home, purposefully failing to give him her phone number, and failing to visit him in the hospital after his requests rise to a level of treatment amounting to cruelty. We therefore conclude that the trial court finding is not in error.
Appellants next argue that the trial court erred in failing to admit evidence of forgery by Mr. Ambrose's widow in connection with a simulated sale of estate property both as substantive evidence and as impeachment evidence. Appellants asserted this evidence was relevant to show Mrs. Ambrose's bias to demonstrate a general scheme of dishonesty surrounding the succession.
It appears to us that appellants' attempt to demonstrate bias, interest or corruption on the part of Mrs. Ambrose was an attempt to question the motives of Mr. Ambrose in the making of the will at issue. The grounds for disinherison exist independently and have been sufficiently demonstrated irrespective of motive. The finding *43 of a valid disinherison moots the question of the validity of the trial court evidentiary ruling.
The judgment appealed is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] The evidence reflects that the November 25th incident was in 1982, rather than 1983. This is apparently a typographical error in the will.
[2] The testimonial assertion was that the parents could not see the children "on numerous occasions." However, the trial court found that she prevented the children from exercising "extended visits."
[3] The trial judge did not address this latter assertion.